**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOSHUA JOHNKE, *et al.*,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. 14-cv-6992
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Judge Robert M. Dow, Jr.
FRANCISCO ESPINAL-QUIROZ,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

**MEMORANDUM OPINION AND ORDER**

This case involves three consolidated lawsuits related to a multi-vehicle accident that occurred in Will County, Illinois on July 21, 2014. Defendant Francisco Espinal-Quiroz, who was driving a semi-tractor carrying a semi-trailer, allegedly collided with several passenger vehicles that were stopped in traffic on Interstate 55, resulting in multiple fatalities. Plaintiffs—administrators of the estates and/or family members of those killed in the accident—sued multiple Defendants, including Steel Warehouse Inc. and Steel Warehouse Company LLC. Currently before the Court are Plaintiff Moses Blopleh's motion for partial summary judgment on Count 6 of the Third Amended Complaint, which seeks to hold Steel Warehouse Company LLC liable as a motor carrier under the theory that Steel Warehouse Inc. is an empty shell and that Steel Warehouse Company LLC is its alter ego[194], and Plaintiff's motion to strike Gerald Lerman's affidavit.[1] For the reasons that follow, the Court grants Plaintiff's motion to strike and grants Plaintiff's motion for partial summary judgment [194]. This case is set for further status hearing on September 7, 2017 at 9:00 a.m.

---

[1] As discussed below, Plaintiff makes this motion in his reply brief, and not as a separate motion. [220, at 10.]

## I.       Background

### A.       Motion to Strike

Plaintiff moves to strike the affidavit of Gerald Lerman [210-1] and the portions of Defendants' Local Rule 56.1(b) Statement of Additional Facts that rely on this affidavit.[2] Because of the shaping role of Local Rule 56.1 fact statements in resolving motions for summary judgment, the Court will first address Plaintiff's motion to strike.

In his affidavit, Gerald Lerman states that he is General Counsel and a Vice President of Steel Warehouse Company LLC and Steel Warehouse Inc. [210-1.] He then makes multiple statements about how Steel Warehouse Company LLC and Steel Warehouse Inc. are separate entities. Plaintiff argues that the statements in Gerald Lerman's affidavit are hearsay because Lerman is testifying about the contents of business documents without first placing the documents into evidence, that Lerman "does not describe the process he undertook to assure his statements were correct, or how he obtained personal knowledge," and that Plaintiffs have never

---

[2] The Court notes that Plaintiff includes various objections in his reply to Defendants' Local Rule 56.1(b) Statement of Additional Facts and further explains his motion to strike in his summary judgment reply brief. [See 222; 220.] This is the preferred practice and conforms to the instructions on the Court's website, which informs parties that:

> Motions to strike all or portions of an opposing party's Local Rule 56.1 submission are disfavored. Under ordinary circumstances, if a party contends that its opponent has included inadmissible evidence, improper argument, or other objectionable material in a Rule 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief, not in a separate motion to strike.

See http://www.ilnd.uscourts.gov/home/Judges.aspx ("Judge Robert M. Dow Jr."; "Summary Judgment—Local Rule 56.1 Submissions"); *Sherden v. Cellular Advantage, Inc.*, 2009 WL 1607598, at *10 (N.D. Ill. June 9, 2009) (explaining that separate motions to strike are disfavored); see also *Yonehara v. American Airlines, Inc.*, at *7 (N.D. Ill. Sept. 30, 2004) ("Before the Court can address Defendant's motion for summary judgment, it must address Plaintiff's motion to strike, which appropriately, was not filed as a separate noticed motion, but addressed within his response to American's motion for summary judgment."); *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 300 F.Supp.2d 606, 613 (N.D. Ill. 2003) ("[T]his bench looks with disfavor on separate motions to strike and expects a party to incorporate any evidentiary objections in either its summary judgment brief or a Local Rule 56.1 statement.").

seen the documents referred to in his affidavit.  [220, at 10–12.]

"It is the task of the Court, with or without a motion to strike, to review statements of material fact and to eliminate from consideration any arguments, conclusions, and assertions that are unsupported by the documented evidence on record yet offered in support of fact statements." *Sherden v. Cellular Advantage, Inc.*, 2009 WL 1607598, at *1 (N.D. Ill. June 9, 2009).  Affidavits are commonly submitted as evidence to support certain proposed findings of fact in a summary judgment motion, as they are "appropriate vehicles to present a party's version of facts of which she has firsthand knowledge." *Cichowski v. Bank of Mauston*, 2006 WL 1727881, at *1 (W.D. Wis. June 22, 2006).  However, an affidavit is admissible in a summary judgment proceeding only if it is sworn to before an officer authorized to administer an oath, such as a notary public.  See *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  Gerald Lerman's two affidavits, [210-1] and [195-6, at Tab 42], are not sworn to before an officer authorized to administer an oath, and thus they are not admissible affidavits.

That is not the end of the inquiry, however.  Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant "under penalty of perjury" and verified as "true and correct" may be used in lieu of a sworn affidavit to support or respond to a motion for summary judgment.  See *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990).  But this statute does not save the day for Defendants, as both of Gerald Lerman's affidavits fail to comply with two of the requirements of § 1746.  First of all, the affidavits are not signed "under penalty of perjury."  Rather, they both contain the language "Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct."  This language is from Section 1-109 of the Illinois Code of Civil Procedure, which is "the Illinois equivalent of § 1746." *Trapaga v. Cent. States Joint Bd. Local 10*, 2007

WL 1017855, at *3 (N.D. Ill. Mar. 30, 2007). Although this certification pursuant to state law might be sufficient in Illinois state court, it does not meet the requirements of § 1746, which applies to federal court. See *Boecherer v. Burling Bank*, 2009 WL 4544695, at *4 (N.D. Ill. Dec. 1, 2009) (granting motion to strike affidavit sworn under Section 1-109 of the Illinois Code of Civil Procedure and explaining that the affidavit was "not being filed pursuant to the Illinois Code of Civil Procedure, but rather pursuant to the Federal Rules of Civil Procedure," and thus the affiant would not be subject to the penalties under Section 1-109 of the Illinois Code of Civil Procedure); *Trapaga*, 2007 WL 1017855, at *3 (striking affidavits that were not sworn under penalty of perjury and rejecting counsel's "inexplicabl[e]" argument that the affidavits were sufficient because they were sworn under 735 ILCS 5/1-109 and thus the affiants would be subject to Illinois perjury penalties, explaining that this argument ignores the fact that the Illinois statute imposes criminal liability for false statements in verified or sworn documents "filed in any *court of this State*").

Additionally, the affidavits are not dated. Thus, they are not admissible as unsworn declarations under 28 U.S.C. § 1746, and the Court need not address Plaintiff's arguments based on hearsay and lack of personal knowledge. See *Kalra v. United States*, 2013 WL 1749385, at *3 (N.D. Ill. Apr. 23, 2013) ("In this case, lacking both a specific date and a notary public's certification, [the declarant's] statement does not qualify as either a sworn affidavit or as an unsworn declaration under 28 U.S.C. § 1746. Consequently, [the] statement is stricken."); *Hu v. Vill. of Maywood*, 2010 WL 276704, at *5 (N.D. Ill. Jan. 19, 2010) ("Plaintiff's affidavit is not dated and does not contain the requisite "under penalty of perjury" language. Therefore, it must be stricken."); *Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014) (noting that a statement "might pass muster as a declaration, which can be substituted for an affidavit and thus

constitute part of the evidentiary record, provided it complies with the formalities required by 28 U.S.C. § 1746"). For all of these reasons, Plaintiff's motion to strike is granted, and the Court will not consider Defendants' fact statements or responses to Plaintiff's fact statements that rely on either of Gerald Lerman's affidavits. With this ruling in mind, the Court turns to the factual background of the case.

### B.     Factual Background

The following facts are drawn primarily from the parties' Local Rule 56.1 statements, [195], [210], and [222]. On July 21, 2014, Ulrike Blopleh and three of her children were involved in a multi-vehicle accident that occurred in Will County, Illinois on July 21, 2014. Defendant Francisco Espinal-Quiroz, who was driving a semi-tractor carrying a semi-trailer, allegedly collided with several passenger vehicles that were stopped in traffic on Interstate 55, resulting in multiple fatalities.

From 2007 to 2011, Espinal-Quiroz was a driver for M & S Management, a union staffing company that leased drivers to operate Steel Warehouse Inc.'s trucks. [210, at ¶ 4; see also 195 at ¶ 17.] In 2011, Espinal-Quiroz started his own business, Espinal Trucking, as a motor carrier under U.S. Department of Transportation ("DOT") number 2170514. [*Id.*] From October 10, 2012 through July 21, 2014, Espinal-Quiroz hauled 269 separate loads for Steel Warehouse Company LLC. [See 195, at ¶ 5; 210, at ¶¶ 5, 6.] Espinal Trucking's invoices state "Steel Warehouse" and do not specify whether this refers to Steel Warehouse Company LLC or Steel Warehouse Inc. [See 195, at ¶ 8; 210, at ¶ 8.] However, Espinal Trucking was paid by Steel Warehouse Company LLC. [See 195, at ¶ 8; 210, at ¶ 8.] The contract terms between Espinal Trucking and Steel Warehouse Company LLC were contained in the bill of lading. [210, at ¶ 6.] There was no contract between Espinal-Quiroz and Steel Warehouse Inc. [195, at ¶ 6;

210, at ¶ 6.]

Steel Warehouse Company LLC is owned by Lerman Enterprises LLC and Lerman Holding Co. Inc. [195, at ¶ 10.] Gerald Lerman testified that the shareholders of Lerman Enterprises LLC and Lerman Holding Co. Inc. are "members of the Lerman family. Those would be my siblings—although, not all of them—and their children." [*Id.*; 210, Exhibit B, 27:2–16.] Steel Warehouse Company LLC buys steel directly in bulk from steel mills and then resells it in smaller lots to industrial clients. [*Id.*, at ¶ 11.] It also treats, tempers, cuts, and removes impurities from steel and provides other value-added services. [*Id.*] Steel Warehouse Company LLC is headquartered on an industrial campus located at 2722 W. Tucker Drive, South Bend, Indiana, its mailing address is P.O. Box 1377, South Bend, IL, 46624-1377, and its main phone number is 574-236-5100. [*Id.*, at ¶ 12.] About 550 people work in the Steel Warehouse Company LLC plant. [*Id.*, at ¶ 13.] Almost all of the top executives of Steel Warehouse Company LLC are "members of the Lerman family." [*Id.*, at ¶ 13.] Steel Warehouse Company LLC's officers are David Lerman (chairman), Michael Lerman (President), Ted Lerman (CEO), and Gerald Lerman (vice-president/general counsel). [210, at ¶ 5.]

Steel Warehouse Inc. is a licensed interstate motor carrier. [see 195, at ¶ 15; 210, at ¶ 15; 195, at Tab 40 (Gerald Lerman Deposition), at 30:25–31:2.] Steel Warehouse Inc. was founded in the 1950's to "handle the transportation requirements of [Steel Warehouse Company LLC]," which has no equipment for transportation. [195, at Tab 40, at 29:2–7.] According to Gerald Lerman, in the 1950's, Steel Warehouse Company LLC's "biggest problem" was that the Interstate Commerce Commission ("ICC") was attempting to regulate the company's insurance requirements and financial disclosures and to impose safety regulations on the company. [210, at ¶ 19; 195, at Tab 47, at 41:11–23.] Gerald Lerman opined that the ICC was attempting to

"impose jurisdiction over the entire company because [Steel Warehouse Company LLC] had a group of drivers" but that many of the ICC regulations "did not pertain to the bulk of [Steel Warehouse Company LLC's] operations." [210, at ¶ 19; 195, at Tab 47, at 41:11–24.] To solve this problem, the Lermans "formed [Steel Warehouse Inc.,] a separate company that dealt solely with transportation." [210, at ¶ 19; 195, at Tab 47, at 41:24–42:3.] Plaintiff contends that Steel Warehouse Company LLC and Steel Warehouse Inc. "were split into separate companies in the 1950's in order to avoid ICC safety and other regulations governing motor carrier operations." [195, at ¶ 19.]

Steel Warehouse Inc. delivers steel to customers, picks steel up from mills, and in some cases, after delivering steel to customers, it picks up steel of third parties and takes it "someplace close to Steel Warehouse [Company LLC]." [*Id.*, at 29:6–12.] Gerald Lerman testified that the job of Steel Warehouse Inc. "is to provide transportation services, first and foremost, for Steel Warehouse Company LLC," although Steel Warehouse Inc. also does backhauls and could do third-party work as well. [210, Exhibit B, 40:2–19.] Gerald Lerman stated that there is "an affiliation" between Steel Warehouse Company LLC and Steel Warehouse Inc., explaining that since the Lerman family members who own Steel Warehouse Inc. made a "fairly heavy investment in trucking equipment," Steel Warehouse Company LLC "want[s] to help" those family members by giving priority to Steel Warehouse Inc. for deliveries of Steel Warehouse Company LLC products. [*Id.*, Exhibit B, 40:2–41:5.]

Steel Warehouse Inc. owns tractors and trailers, and it leases drivers from M & S Management. [*Id.*, at 31:13–15.] The drivers are not direct employees of Steel Warehouse Inc. [195, at ¶ 17.] Applicants for driving positions are notified that "[a]ll drivers will have a firm understanding that, if selected for hire, they will be employed by M & S Management and not

Steel Warehouse Inc.  However, if a driver is selected for employment[,] their direct supervisors will be Steel Warehouse employees and not M & S Management."  [*Id.*; 195, at Tab 43.]

Another company called J.H. Jones LLC, which is located "on Tucker Drive, across the street from Steel Warehouse," arranges for the delivery of Steel Warehouse Company LLC's products.  [210, Exhibit B, 35:23–25.]  J.H. Jones dispatches the Steel Warehouse Inc. trucks first, and if Steel Warehouse Company LLC has additional loads that need to be shipped, then J.H. Jones LLC finds outside motor carriers to ship the additional loads.  [210, at ¶ 15.]  The goal of Steel Warehouse Inc. is not to turn a profit; rather, its goal is to get the steel delivered to its customers without losing money.  That is, its purpose is to get the product to the customer at the same cost as it would cost Steel Warehouse Company LLC to use another carrier to transport the product.  [195, at ¶ 26; 210, at ¶ 26.]  Steel Warehouse Inc. does not have any actual employees. [210, at ¶39; 210, Exhibit B, 48:25–49:3.]  Rather, "the people from J.H. Jones" operate Steel Warehouse Inc.  [210, at ¶ 40.]

J.H. Jones is owned by four of Gerald Lerman's siblings.  [210, Exhibit B, 34:1–2.] Gerald Lerman testified that he "may be an officer at J.J. Jones" but was "not sure."  [*Id.*, at 34:3–10.]  Defendants deny that Steel Warehouse Company LLC owns any trucks.  However, Gerald Lerman testified that J.H. Jones "began operating primarily to do [ ] maintenance on Steel Warehouse Equipment" and that J.H. Jones "also took over the maintenance of the trucks" and "assumed the job of managing the trucking operation, to the extent they would go out and get loads that were not covered by Steel Warehouse Inc. drivers."  [*Id.*, at 35:3–15.]  Steel Warehouse Company LLC's human resources department hires employees for J.H. Jones.  [210, at ¶ 14; see also 195, Tab 37, 87:8–25; 210, Exhibit E, 22:2–23:8.]

On the date of the accident at issue, Cheryl Sweeney, who worked as a dispatcher for J.H.

Jones, dispatched Espinal-Quiroz of Espinal Trucking. [210, at ¶ 40.] Sweeney was issued an employee identification badge that she uses to access her place of employment at Steel Warehouse Company LLC's facility. [*Id.*] The badge says "Steel Warehouse" on it and has the Steel Warehouse logo on it. [*Id.*] Sweeney's email address is cheryls@steelwarehouse.net. [195, at ¶ 44.] Gerald Lerman testified that "[t]here is no transportation department at Steel Warehouse Company LLC." [210, at ¶ 24.] However, Defendants admit that "[e]veryone in the transport department [including Cheryl Sweeney] has an email address with their first name at steelwarehouse.net." [210, at ¶ 44.] Additionally, Sweeney testified that she was an employee of J.H. Jones, and not of Steel Warehouse Company LLC, [210, Exhibit E, 21:11–20], but she referred to the Steel Warehouse IT department as "[o]ur IT department." [*Id.*, Exhibit E, 48:20–24.] She also stated that a staffing service "got [her] into the Steel Warehouse in the transportation department," before she corrected herself and stated, "In the garage. Excuse me. [The staff service] got me into the garage." [*Id.*, Exhibit E, 18:12–25.] Sweeney explained that she worked in the Steel Warehouse garage as a "third-shift maintenance clerk" and that she would hand out keys to the drivers, key in the maintenance reports, and hand out supplies for "the Steel Warehouse trucks." [*Id.*, Exhibit E, 19:23–20:12.] Sweeney worked at this position from January 2002 until August 2002, when she was hired by J.H. Jones for "an opening in the transportation dispatch window position." [*Id.*, Exhibit E, 19:7–8; 21:8–13; 22:2–5.]

Despite the fact that Steel Warehouse Inc. does not have any actual employees, the "Company Directory" for Steel Warehouse Inc. lists Alan Chamblee as Transportation Manager, Wayne Cenceleski as Fleet Safety Manager, Jahala Naumovski as Fleet Dispatcher, Susan Windsor as Payroll and Trip Reports, and Nancy Palmer as Fleet Maintenance Manager. [195, at ¶ 39.] Gerald Lerman testified that none of these people are actually employees of Steel

Warehouse Inc., but rather are employees of J.H. Jones and M & S Management. [210, at ¶ 39; 210, Exhibit B, at 48:15–20.] He further testified that the list is "simply a shorthand way of helping third parties know who to call if they wanted something done with respect to Steel Warehouse Inc. equipment." [210, Exhibit B, at 50:8–12.] Gerald Lerman testified that "[t]he people who prepared [the directory] were not knowledgeable [ ] about the different entities that make up the different aspects of the operations located in the businesses that we own. They're just not aware of J.H. Jones or anything like that." [*Id.*, at 50:16–21.]

The owners of Steel Warehouse Inc. are Gerald Lerman and four of his siblings: David, Michael, James, and Ted Lerman. [195, at Tab 28 (Gerald Lerman Deposition), at 28:12–15.] The Indiana Secretary of State lists the following officers of Steel Warehouse Inc.: Gerald Lerman's son Shlomo Lerman (president and treasurer); Michael Lerman's daughter Naomi Rosenman (vice president and secretary); and Gerald Lerman (vice president). [*Id.*, at 28:16–24; 195, at ¶ 29.] However, the Biannual Reports filed with the Federal Motor Carrier Safety Administration ("FMCSA") list different corporate officers for Steel Warehouse Inc. According to the Biannual Reports, Gerald Lerman is president and Ted Lerman is vice president. [195, at ¶ 30.] These reports were filed with the FMCSA by Wayne Cencelewski, the Fleet Safety Director of J.H. Jones LLC. [*Id.*; 210, at ¶ 30.] Gerald Lerman testified that the indication of himself as president and Ted Lerman as vice president of Steel Warehouse Inc. was incorrect. [210, at ¶ 30.] Naomi Rosenman and Shlomo Lerman do not "draw paycheck[s] from Steel Warehouse Inc." [210, at ¶ 27; 195, at Tab 64, at 131:18–20.] Similarly, the president of J.H. Jones, David Lerman, did not receive a separate paycheck from J.H. Jones. David Lerman is also CEO of Steel Warehouse Company and was paid entirely by Steel Warehouse Company LLC. [195, at Tab 46 (Lerman Deposition), at 105:17–106:4.] In fact, "none of the officers of

Steel Warehouse Company LLC who [did] any work for any of the other companies [received] a separate paycheck. They were paid completely by Steel Warehouse Company LLC." [*Id.*, at 106:5–15; 195, at ¶ 18; 210, at ¶ 18.]

Plaintiff contends that the addresses of Steel Warehouse Inc., according to its regulatory filings, are P.O. Box 1377, South Bend, Indiana 46624, and 2722 W. Tucker Drive, South Bend, Indiana 46619, which are also the addresses of Steel Warehouse Company LLC. [195, at ¶ 15; 195, at Tab 41.] However, Defendants contend that Steel Warehouse Inc.'s address is 2730 West Tucker Drive and that Steel Warehouse Inc. and Steel Warehouse Company LLC do not share an address. [See 210, at ¶ 15; 210, Exhibit B (Gerald Lerman Deposition), at 175:1–7.] Steel Warehouse Company LLC and Steel Warehouse Inc. share a corporate logo, web address, email address, and computer system, and they both use P.O. Box 1377 and the phone number 574-236-5100. [195, at ¶ 23; 210. at ¶ 23.] Steel Warehouse Inc.'s trucks are housed at Steel Warehouse Company LLC's plant. [210, at ¶ 24.]

Steel Warehouse Company LLC has its own website, www.steelwarehouse.com, where it promotes the sale of steel and states: "Our red trucks travel through the Interstate throughout the greater Midwest day and night providing timely door-to-door delivery." [195, at ¶ 32.] The website further states that Steel Warehouse Company LLC uses "our own fleet of trucks," and that "[s]urrounded by a portion of the 50 tractor trailer fleet, Vice President of Operations Bill Lerman manages the necessary company resources to deliver the right material, to the right place at the right time." [*Id.*, at ¶ 33; 210, at ¶ 33.] Gerald Lerman testified that the reference to "our own fleet of trucks" is referring to the fleet of trucks owned by "Steel Warehouse Inc., the affiliate company, that [Steel Warehouse Company LLC] use[s] for these transportation services." [195, at ¶ 34; 195, at Tab 74, 102:1–21.] Steel Warehouse Company LLC's website

also features a video of a Steel Warehouse Inc. truck making a delivery. [195, at ¶ 34.] Additionally, the website of Precision Metalforming Associates contains a company profile of Steel Warehouse Company LLC, which states "We offer our truck fleet of 57 units to our customers to assure our deliveries." [195, at ¶ 33.]

### C. Procedural Background

Plaintiff Moses Blopleh, individually and as Special Administrator of the Estate of Ulrike Blopleh, deceased, and as parent and next-friend of A.B., a minor, A.B., a minor, and A.B., a minor, filed a third amended complaint [168] on July 14, 2016. This 33-page, 70-count complaint includes, *inter alia*, claims against Steel Warehouse Inc. for "vicarious liability for agent/statutory employee," (Count 1), negligent selection of independent contractor (Count 3), and failure to require observance of driver regulations (Count 4). Count 6 is brought against Steel Warehouse Company LLC and alleges that "in actual practice, [Steel Warehouse Inc.] holds a motor carrier license for and on behalf of [Steel Warehouse Company LLC]" and that "in actual practice, [Steel Warehouse Company LLC] is the person providing motor vehicle transportation for compensation within the meaning of 49 U.S.C. § 13102 (14) and 49 C.F.R. § 390.5."[3] [168, at ¶ 36.] Plaintiff further alleges that Steel Warehouse Company LLC is thus liable for Espinal-Quiroz's alleged negligence. [*Id.*, at ¶ 37.]

---

[3] 49 U.S.C. § 13102 states that "[t]he term 'motor carrier' means a person providing motor vehicle transportation for compensation."

49 C.F.R. § 390.5 states, in relevant part:

> Motor carrier means a for-hire motor carrier or a private motor carrier. The term includes a motor carrier's agents, officers and representatives as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories. For purposes of subchapter B, this definition includes the terms employer, and exempt motor carrier.

## II.     Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). However, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

## III.    Analysis

### A.     Choice of Law

The only issue that the Court is asked to decide in this motion for partial summary judgment is whether Steel Warehouse Inc. and Steel Warehouse Company LLC are alter egos, such that the corporate form should be disregarded.[4] However, the Court must first address choice of law. Plaintiff assumes that Indiana law applies without making a choice of law argument or responding to Defendants' choice of law argument. Defendants Steel Warehouse Inc. and Steel Warehouse Company LLC (collectively, "Defendants") argue that the result is the same under Illinois or Indiana law, but that Illinois law "more strongly favors that [Steel

---

[4] Although the parties allude to other issues in their briefing, the Court does not express an opinion on these other issues, such as whether Espinal-Quiroz can be considered an agent or employee of any entity other than Espinal Trucking, or whether Steel Warehouse Company LLC or Steel Warehouse Inc. owe a duty to Plaintiff.

Warehouse Inc.] and [Steel Warehouse Company LLC] are separate companies and not alter egos." [211, at 6.]

A federal court sitting in diversity is obligated to apply the substantive law of the forum state, here, Illinois, including its choice-of-law rules. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 729 (7th Cir. 2014). Under Illinois choice of law principles, a choice-of-law determination "is required only when a difference in law will make a difference in the outcome." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014); see also *Spitz*, 759 F.3d at 729. "The party seeking the choice-of-law determination bears the burden of demonstrating a conflict, *i.e.*, that there exists a difference in the law that will make a difference in the outcome." *Id.* Here, Plaintiff does not argue that the choice of law is outcome determinative and does not present an argument as to why the Court should apply Indiana law. Further, as discussed below, there is no relevant difference between Illinois and Indiana law governing the case at hand, as Illinois and Indiana courts look at similar factors when assessing whether corporations are alter egos of one another. Thus, the Court need not conduct a choice of law analysis and will apply the law of the forum state, Illinois. See *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011) (upholding district court's decision to apply Illinois law where neither party pointed to a conflict between Missouri and Illinois law, and thus the district court did not need to make a choice of law decision and properly assumed that Illinois law applied); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("[T]he parties have not identified a conflict between the two bodies of state law that might apply to their dispute, [so] we will apply the law of the forum state—here, Illinois.").

B.     **Alter Egos**

Plaintiff argues that Steel Warehouse Company LLC and Steel Warehouse Inc. should be

treated as one entity under the alter ego doctrine. "To call corporations alter egos is to say that they are one—that a single business uses a variety of corporate names and charters but is still just one entity." *United States v. Vitek Supply Corp.*, 151 F.3d 580, 585 (7th Cir. 1998). Under Illinois law: "Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Northbound Grp., Inc. v. Norvax*, Inc., 795 F.3d 647, 652 (7th Cir. 2015) (quoting *Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981)) (internal quotation marks omitted). The alter ego analysis is "heavily fact-oriented." *Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Systems, Inc.*, 1999 WL 47078, at *5 (N.D. Ill. Jan. 20, 1999).

To determine whether a corporation is so controlled by another to justify piercing the corporate veil and disregarding their separate identities, Illinois courts focus on four factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991) (quoting *Van Dorn Co. v. Future Chemical and Oil Corp*, 753 F.2d 565, 570 (7th Cir. 1985)) (internal quotation marks omitted). Courts also consider additional factors, such as failing to issue stock, failing to pay dividends, corporate insolvency, nonfunctioning corporate officers, missing corporate records, diverting assets to an owner or other entity to creditor detriment, failing to maintain an arm's-length relationship among related entities, and whether

the corporation is a mere façade for a dominant owner.[5] *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012). No single factor is determinative. *Id.*

Applying that controlling law to the case at hand, there is ample undisputed evidence indicating that Steel Warehouse Inc. is a mere instrumentality of Steel Warehouse Company LLC such that the two companies should be treated as alter egos. First of all, the history of Steel Warehouse Inc.'s creation suggests that it is a "mere façade" for Steel Warehouse Company LLC. When Steel Warehouse Company LLC had problems with ICC's regulations, it split its transportation department off as Steel Warehouse Inc. so that the ICC would no longer regulate Steel Warehouse Company LLC. Once the split occurred, there was no "arm's length relationship" between the two companies. Rather, Gerald Lerman acknowledged that there is "an affiliation" between Steel Warehouse Company LLC and Steel Warehouse Inc. such that Steel Warehouse Company LLC "help[s]"the Lerman family members who own Steel Warehouse Inc. by giving priority to Steel Warehouse Inc. for deliveries of Steel Warehouse Company LLC products. [See 210, Exhibit B, 40:2–41:5; 210, at ¶ 15]; cf. See *Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO,*

---

[5] Similarly, under Indiana law, the corporate form "may be disregarded where one corporation is so organized and controlled and its affairs so conduct that it is a mere instrumentality or adjunct of another corporation." *Continental Cas. Co. v. Symons*, 817 F.3d 979, 993 (7th Cir. 2016) (quoting *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 462 (Ind. Ct. App. 2000)) (internal quotation marks omitted). Indiana courts consider the *Aronson* factors, which include: undercapitalization, absence of corporate records, fraudulent representation by corporation shareholders or directors, use of the corporation to promote fraud, injustice or illegal activities, payment by the corporation of individual obligations, commingling of assets and affairs, failure to observe required corporate formalities, or other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form." *Id.* (citing *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994)). Where an Indiana court "is asked to decide whether two or more affiliated corporations should be treated as a single entity, the analysis expands to consider other factors," including "whether similar corporate names were used; whether there were common principle corporate officers, directors, and employees; whether the business purposes of the corporation were similar; and whether the corporations were located in the same offices and used the same telephone numbers and business cards." *Id.* (quoting *Smith*, 744 N.E.2d at 463). Thus, as discussed above, the alter-ego analyses under Illinois law and Indiana law are similar enough that the choice of law is not outcome determinative in this case.

417 U.S. 249, 261 (1974) ("It is important to emphasize that this is not a case where the successor corporation is the 'alter ego' of the predecessor, where it is 'merely a disguised continuance of the old employer.' Such cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." (internal citation omitted)).

The evidence also shows that Steel Warehouse Company LLC treats the assets of Steel Warehouse Inc. as its own. Defendants deny that Steel Warehouse Company LLC owns any trucks. However, Steel Warehouse Inc.'s trucks are housed at Steel Warehouse Company LLC's plant, [210, at ¶ 24], and J.H. Jones employees—who are hired by Steel Warehouse Company LLC's human resources department, work at Steel Warehouse Company LLC's facility, have employee identification badges that stay "Steel Warehouse" on them, and have Steel Warehouse email addresses—work on the maintenance of Steel Warehouse Inc.'s trucks. Further, Steel Warehouse Company LLC promotes its "own fleet of trucks" on its website and admits that this refers to Steel Warehouse Inc.'s trucks. [195, at ¶ 34; 195, at Tab 74, 102:1–21.]

Additionally, there is at least some confusion with Steel Warehouse Inc.'s corporate recordkeeping. The Indiana Secretary of State lists the following officers of Steel Warehouse Inc.: Gerald Lerman's son Shlomo Lerman, president and treasurer; Michael Lerman's daughter Naomi Rosenman, vice president and secretary; and Gerald Lerman, vice president. [195, at 28:16–24; 195, at ¶ 29.] In contrast, the Biannual Reports filed with the Federal Motor Carrier Safety Administration ("FMCSA") list Gerald Lerman as president and Ted Lerman as vice president. [195, at ¶ 30.] Further, Shlomo Lerman and Naomi Rosenman are not paid by Steel

Warehouse Inc. In fact, "none of the officers of Steel Warehouse Company LLC who [did] any work for any of the other companies [received] a separate paycheck. They were paid completely by Steel Warehouse Company LLC." [195, at 106:5–15; 195, at ¶ 18; 210, at ¶ 18.]

In short, the record indicates that Steel Warehouse Inc. exists solely for the benefit of Steel Warehouse Company LLC. It is undisputed that the goal of Steel Warehouse Inc. is not to turn a profit, but rather to deliver Steel Warehouse Company LLC's products to customer without losing money. [195, at ¶ 26; 210, at ¶ 26.] There is overlapping ownership, as Steel Warehouse Company LLC is owned by Lerman Enterprises LLC and Lerman Holding Co. Inc., which in turn are owned by Gerald Lerman, some of his siblings, and their children, [195, at ¶ 10; 210, Exhibit B, 27:2–16], and Steel Warehouse Inc. is similarly owned by Gerald Lerman and four of his siblings, David, Michael, James, and Ted Lerman. [195, at Tab 28, at 28:12–15.] Steel Warehouse Inc., which has no employees of its own, essentially operates as the transportation department of Steel Warehouse Company LLC. It is located on Steel Warehouse Inc.'s industrial campus, and the two companies also share a phone number, corporate logo, web address, email address, P.O. Box, and computer system. [195, at ¶ 23; 210. at ¶¶ 23–24.] See *Board of Trustees, Chicago Plastering Institute Pension Trust Fund v. William A. Duguid Co.*, 761 F.Supp. 1345, 1348 (N.D. Ill. 1991) (explaining that alter ego relationships generally exist where enterprises share management, business purpose, operations, equipment, supervision, and ownership). Steel Warehouse Company LLC and Steel Warehouse Inc. hold themselves out to the public as one entity, as the steelwarehousecompany.com website promotes the sale of Steel Warehouse Company LLC's steel products and advertises delivery using "our" trucks, which admittedly are Steel Warehouse Inc.'s trucks.

Without Steel Warehouse Company LLC, Steel Warehouse Inc. would essentially be

inoperable, as it would own trucks, but would have no employees, no method of paying its officers, no location to store its trucks, and no shipments to deliver. Thus, the Court concludes that Steel Warehouse Inc. is mere instrumentality of Steel Warehouse Company LLC. See *Sea-Land Servs.*, 941 F.2d at 521 (holding that there was "no doubt that the shared control/unity of interest and ownership" requirement had been met where the corporate defendants were "little but [the shareholder's] playthings," the shareholder was either the sole shareholder or one of two shareholders of each corporation, and the shareholder ran all of the corporations out of the same office, with the same phone line and expense accounts); *Chicago Dist. Council of Carpenters Pension Fund*, 1999 WL 47078, at *5–6 (lack of respect for separate corporate identities evidenced by common management, common business purpose, shared business address and phone number, common employees, common ownership, commingling of corporate assets, and fact that the same individual controlled day-to-day operations of all three corporations).

Next, the Court must assess whether circumstances are such that "adherence to the fiction would sanction a fraud or promote injustice." *Van Dorn*, 753 F.2d at 570 (citation and internal quotation marks omitted). The Seventh Circuit has explained that Illinois law does not require the party seeking to pierce the corporate veil to establish an intent to defraud creditors. *Id.* Rather, the moving party must establish "*either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice." *Id.* The Seventh Circuit has noted that "promote injustice" means "something less than an affirmative showing of fraud." *Sea-Land Servs., Inc.*, 941 F.2d at 522. However, the prospect of an unsatisfied judgment is not, in and of itself, enough to satisfy this requirement. See *id.*, at 522–23 ("[I]f an unsatisfied judgment is enough for the 'promote injustice' feature of the test, then *every* plaintiff will pass on that score, and *Van Dorn* collapses into a one-step 'unity of interest and ownership' test.").

Here, Steel Warehouse Company LLC and Steel Warehouse Inc. manipulated the corporate form by conducting business as a single enterprise, while shielding Steel Warehouse Company LLC from liability related to transportation and Federal Motor Carrier Safety Regulations by operating Steel Warehouse Inc.—which is essentially Steel Warehouse Company LLC's transportation department—as a "separate" motor carrier. Steel Warehouse Inc. was created to serve Steel Warehouse Company LLC and not to turn a profit, and thus if and when Steel Warehouse Inc. incurs liability in the course of delivering Steel Warehouse Company LLC's products, Steel Warehouse Inc. does not have the necessary assets to cover the liability. In these circumstances, the Court concludes that permitting Defendants to manipulate the corporate form to escape liability in this manner would promote injustice. See *Sea-Land Servs., Inc.*, 941 F.2d at 524 (noting that injustice would be promoted if parties could intentionally manipulate corporations so that one assumed liabilities but held no assets, while the other corporation received the assets but not the liabilities); *Van Dorn*, 753 F.2d at 571 (piercing the corporate veil was appropriate where two corporations were intermingled such that during the course of the suspect "intercorporate transactions" between the two allegedly separate entities, the first corporation profited to the detriment of the second corporation, which injured the second corporation's creditor); *Vitek Supply Corp.*, 151 F.3d at 585 ("Many cases hold that corporations cannot escape their obligations under judgments entered by federal courts by playing a shell game with assets."); *Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 701 (7th Cir. 2010) ("The 'injustice' component comes to the fore when a creditor's claim is based on tort law, because victims rarely understand in advance that they are dealing with shell corporations (if indeed they understand before the injury that they are dealing with anyone at all).").[6]

---

[6] The Court would reach the same conclusion under Indiana law. See *Continental Cas. Co.*, 817 F.3d at 996 (applying Indiana law and explaining that the separateness of affiliated corporations should be

In sum, the Steel Warehouse Inc. is a mere instrumentality of Steel Warehouse Company LLC, and observing "the fiction of separate existence" would promote injustice. *Northbound Grp., Inc.*, 795 F.3d at 652. Therefore, the Court grants Plaintiff's partial motion for summary judgment [194], and Steel Warehouse Company LLC and Steel Warehouse Inc. shall be treated as one entity under the alter ego doctrine. The Court emphasizes that, as stated above, the only issue that the Court was asked to decide in this motion for partial summary judgment is whether Steel Warehouse Inc. and Steel Warehouse Company LLC are alter egos, and thus the Court expresses no opinion on other issues that may arise in the course of this lawsuit, such as whether Espinal-Quiroz can be considered an agent or employee of Steel Warehouse Inc. and Steel Warehouse Company LLC, or whether Steel Warehouse Company LLC and Steel Warehouse Inc. owe a duty to Plaintiff.

## IV.    Conclusion

For the reasons stated above, the Court grants Plaintiff's motion to strike and grants Plaintiff's motion for partial summary judgment [194]. This case is set for further status hearing on September 7, 2017 at 9:00 a.m.

Dated: August 23, 2017

Robert M. Dow, Jr.
United States District Judge

---

disregarded where the entities "are manipulated or controlled as one enterprise through their interrelationship to cause illegality, fraud, or injustice or *permit one economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise*" (emphasis added)).